# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| AUTOMOTIVE BODY PARTS ASSOCIATION | § § § | |
| V. | § § | CASE NO. 4:13-CV-705 Judge Clark/Judge Mazzant |
| FORD GLOBAL TECHNOLOGIES, LLC | § § | |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Ford's Motion to Dismiss for Lack of Standing Under Fed. R. Civ. P. 12(b)(1) (Dkt. #7). After considering the motion, the responses, and the relevant pleadings, the Court recommends the motion be denied.

### BACKGROUND

The Automotive Body Parts Association ("ABPA") filed the present suit for declaratory judgment asserting that six design patents on automotive body repair parts owned by Ford Global Technologies, LLC ("Ford") are "invalid and/or unenforceable under the doctrines of patent exhaustion and/or functionality and are not infringed by ABPA members" (Dkt. #1 at 3, ¶ 11). The design patents are "D489299 (Exterior of Vehicle Hood); D489657 (Vehicle Side View Mirror); D494517 (Vehicle Side View Mirror); D496890 (Vehicle Grill); D501685 (Vehicle Head Lamp); and D508223 (Fender)." *Id.* at 4, ¶ 13.

On February 21, 2014, Ford filed its motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1), asserting that the ABPA lacks associational standing to bring suit on behalf of its members (Dkt. #7). On March 20, 2014, the ABPA filed its response (Dkt. #15). On April 7, 2014, Ford filed its reply (Dkt. #17). On April 22, 2014, the ABPA filed its sur-reply (Dkt. #20).

## ANALYSIS

Standing is a threshold subject matter jurisdictional requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). Plaintiff has the burden of demonstrating standing. *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003). Standing must be present when the plaintiff brings suit, and cannot be cured retroactively. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted). "In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute." *Id.* (citation omitted).

> Article III of the Constitution limits the federal juridical power to "Cases" or "Controversies," thereby entailing as an irreducible minimum that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision.

*Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 550 (1996) (internal quotations omitted)). The ABPA does not assert that it has standing on its own to satisfy the case or controversy requirement of Article III, but rather asserts associational standing on behalf of its members.

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id*. (quoting *United Food*, 517 U.S. at 553); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). These three factors are referred to as the *Hunt* factors. *See Hunt*, 432 U.S. at 343.

Ford first argues that associational standing against a patentee is unprecedented. Ford contends that the Federal Circuit rejected standing of an association against a patentee in the only case in which it faced the issue: *Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office ("Myriad")*, 653 F.3d 1329, 1308 (Fed. Cir. 2011), *rev'd in part on other grounds by* 133 S.Ct. 2107 (2013). Ford also argues that the fact-specific nature of patent cases makes them unsuitable for associations to assert standing on behalf of their members. While the Court agrees that there is little case law in which associational standing was permitted against a patentee, it is not entirely accurate to say that it is unprecedented. As the ABPA points out, in the *Myriad* case, the Federal Circuit determined that the associations did not have standing because there was not declaratory judgment standing under the *MedImmune* standard, not based on the associational standing of the organizations. *Myriad*, 653 F.3d at 1308. The three prongs for associational standing were established and unchallenged in the district court. *Ass'n for Molecular Pathology v. USPTO*, 669 F. Supp. 2d 365 (S.D.N.Y. 2009). In addition, the Federal Circuit has permitted associational standing in other intellectual property cases involving trademark and copyright. *See Institut Nat. Des Appellations v. Vintners*, 958 F.2d 1574 (Fed. Cir. 1992) (finding an association of wine growers and merchants had standing to contest the trademark application); *Jewelers Vigilence Comm. v. Ullenberg Corp.*, 823 F.2d 490 (Fed. Cir. 1987) (finding a non-profit trade association had standing to bring claims on behalf of its members). Finally, the Court recognizes that although associational standing in a patent case may be rare, the *Hunt* factors for establishing associational standing are adequate to ensure the protection of a patentee

against cases in which no member has standing, the organization is not representing interests that are germane to its purpose, or which require individualized participation of members in the lawsuit. The test is structured to avoid allowing associational standing in cases where the proof would be too fact-specific. Thus, the Court sees no reason not to consider the associational standing of the ABPA simply because it is asserting patent claims against a patentee.

Next, Ford argues that the ABPA cannot meet the first *Hunt* prong because it has not identified any member with declaratory judgment standing, and has not satisfied the "all circumstances" test set out in *MedImmune v. Genentech*, 549 U.S. 118, 127 (2007). The first *Hunt* prong requires that "some member of [the] organization would have standing to bring a similar action itself." *Biotechnology Indus. Org.*, 496 F.3d at 1370 (citing *United Food*, 517 U.S. at 552 ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.")). "One such member will suffice." *Id*.

Although in its response brief the ABPA argued that it was not required to identify a specific member at the pleading stage, the ABPA has since abandoned that argument, and asserts that its member New World International, Inc. ("New World") would have standing to sue in its own right.[1] In its Complaint, the ABPA asserts that Ford accused one or more ABPA members in writing of infringing Ford design patents (Dkt. #1 at ¶ 13). New World received one of these "cease and desist" letters from Ford, and responded in a June 2013 letter that:

> The purpose of this letter is to provide the acknowledgement you seek. New World's policy is to honor the Ford design patents. We trust that this

---

[1] The Court generally does not condone presenting such an argument for the first time in the ABPA's sur-reply brief because at this juncture, Ford has not had an opportunity to respond to the ABPA's new argument and factual allegations. However, the Court will consider the argument in light of the fact that Ford also presented a new factual challenge with new evidence in its reply brief, to which the ABPA was responding.

4

>  acknowledgement satisfies your demand and resolves the matter of which you complain.

(Dkt. #20, Ex. 8). In its reply brief, Ford asserted that this resolved the conflict between Ford and New World. However, Ford and New World continued to communicate and Ford continued to allege that New World infringed Ford's design patents. An October 17, 2013 email from Ford stated:

> Your letter of June 18, 2013 stated that "New World's policy is to honor the Ford design patents." However, upon review of New World's websites recently, we found that products covered by Ford's design patents continue to be offered for sale.
>
> Ford has been extremely patient, but their patience will not continue while your client continues to infringe their patent rights. Your client must take prompt action to cease and desist their unauthorized use of Ford's intellectual property and address the issues we raised in our previous correspondence. Attached again here is the draft agreement we forwarded in August.

*Id*. at Ex. 12. The attached agreement required New World to, inter alia, (1) admit design patent infringement, (2) immediately and permanently cease and desist sales of the accused products, (3) provide an accounting of units sold and itemized revenue, (4) confirm disposition of the accused products, (5) provide names and addresses of suppliers of the accused products, and (6) allow future audits of New World by Ford. *Id*. at Ex. 9. Ford sent another email on November 13, 2013, stating that New World must take immediate action to cease and desist sales of the unauthorized products, and giving New World deadlines by which they must remove the products from their websites and provide written assurance that the products would no longer be for sale. *Id*. at Ex. 16. On November 20, 2013, New World replied that New World had removed the accused products from its website and it assured Ford that it would not offer the listed parts for sale, but it indicated that the assurance was given without admission by New World that Ford's patents were valid and enforceable, and that the assurance would

automatically terminate if the patents alleged to apply to the accused products were determined to be invalid and unenforceable. *Id*. at Ex. 17. This litigation was filed five days later.

These letters indicate that there is a justiciable controversy between Ford and at least one member of the ABPA, New World, and that declaratory judgment jurisdiction exists in this case under the *MedImmune* test. To have standing to sue for declaratory judgment relief, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127. The Federal Circuit has stated, "[a]nd, of course, if 'a party has actually been charged with infringement of the patent, there is, necessarily, a case or controversy adequate to support [declaratory judgment] jurisdiction." *3M Company v. Avery Dennison Corp*., 673 F.3d 1372, 1379 (Fed. Cir. 2012) (citing *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 96 (1993)). In its cease and desist letters, Ford accused New World of infringing the design patents, which is sufficient to establish that New World would have standing in its own right to bring an action for declaratory judgment against Ford. The first *Hunt* prong is satisfied.

Next, Ford argues that the ABPA has not demonstrated that this suit is germane to the organization's purpose. Ford contends that the limited nature of the six design patents does not impact the broader interests of the ABPA membership, and the ABPA cannot serve as an adequate representative of the disparate and conflicting goals of its members. Ford asserts that the member companies did not vote and were not asked for their approval for the representation, and the ABPA's interests in this litigation are directly in conflict with its member LKQ Corporation's ("LKQ") interests as the alleged exclusive licensee of the six design patents.

The ABPA must demonstrate "a nexus between its organizational purpose and the economic interests of the [members] it purportedly represents." *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544 (1986). The ABPA bylaws provide in relevant part that objectives of the ABPA are "[t]o promote fair and honorable trade practices between the membership and the customers of the membership of the Association," "[t]o discourage unfair competition and violation of business customs and usages of the trade," "[t]o creatively expand the role to the Distributor and to open up new business opportunities and services to the independent autobody shops and dealers," and "[t]o foster good will between the industry, its factory suppliers, customers, and other industries influencing industry growth (i.e., the insurance industry)" (Dkt. #1 at ¶ 9). In this litigation, the ABPA seeks a declaration that the six Ford design patents are invalid, unenforceable, and, thus, not infringed by ABPA members, and a permanent injunction prohibiting Ford from enforcing or attempting to enforce these six design patents against ABPA members. The ABPA alleges that the practical legal effect of the requested relief will "permit ABPA members to purchase, offer for sale, and sell automotive body repair parts for Ford Motor Company automobiles without the threat or potential consequences of design patent infringement litigation" (Dkt. #1 at ¶ 19). "The germaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Medical Board*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (citing *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc*., 448 F.3d 138, 148 (2d Cir. 2006)). The ABPA has met this low threshold to show that the interests it represents are germane to the purposes of the ABPA organization. For example, if the named patents are rendered invalid and/or unenforceable, then all ABPA members can sell these parts without obtaining a license from Ford to do so. This is certainly relevant to the ABPA's objectives to

promote fair and honorable trade practices between the membership and its customers and to discourage unfair competition and violation of business customs and usages of the trade.

However, Ford also asserts, in relation to the second prong's germaneness requirement, that the ABPA cannot serve as a representative of all of its members, since its interests in this litigation are directly in conflict with its member LKQ. Specifically, Ford argues that "the present suit does not involve broad homogenous associational principles but instead is effectively a suit between members" and "[t]he suit directly pits a handful of members that purportedly have or are ready to sell products subject to the six design patents against the interest of the exclusive licensee, long-time association member LKQ, the largest supplier of aftermarket parts in the United States" (Dkt. #7 at 14). Ford argues that a profound conflict of member interest exists, which bars associational standing in this case.

It appears that there is a split in the circuits on when a conflict between members will defeat associational standing. *See, e.g., Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 603-07 (7th Cir. 1993) (discussing circuit split).[2] One view suggests that conflicts of interest among group members are not relevant to whether associational standing should be permitted. *See, e.g., Associated General Contractors of California v. Coalition for Economic Equity*, 950 F.2d 1401 (9th Cir. 1991) ("[A]n organization's internal conflicts properly should be resolved through its own internal procedures, not through limitations on standing."); *National Maritime Union v. Commander, Military Sealift Command*, 824 F.2d 1228, 1231-34 (D.C. Cir. 1987) (conflicting interests among members will not defeat union's standing to urge the interests of some member in litigation). These circuit court decisions rely on the Supreme Court's holding in *Brock*, noting that the Supreme Court "appeared to deal with the problem of

---

[2] It also appears that the various circuits have addressed this issue under both the second and third prongs of the *Hunt* associational standing test. As the parties have addressed the issue in conjunction with the second prong, the Court will do so as well.

8

conflicting interests by saying that associational standing was too valuable to jettison and offering possible safeguards for members whose interests were adverse to the litigating position taken by the association." *Nat'l Maritime Union*, 824 F.2d at 1233 (citing *Automobile Workers v. Brock*, 477 U.S. 274, 288-90 (1986)). To the extent an individual member has a conflict, "if they had standing, [they] could intervene to advance their interests against the association's position on the merits." *Id*. The opposing view finds that "profound" conflicts of interests among the members may defeat associational standing. *See Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246 (4th Cir. 1991); *Retired Chicago Police Ass'n v. City of Chicago ("RCPA I")*, 7 F.3d 584 (7th Cir. 1993); *Hospital Council of Western Pennsylvania v. City of Pittsburgh*, 949 F.2d 83 (3d Cir. 1991); *Associated General Contractors of North Dakota v. Otter Tail Power Co.*, 611 F.2d 684, 691 (8th Cir. 1979). The Seventh Circuit stated that a "profound conflict arises" in two situations: (1) "where an association seeks standing to directly sue some of its own members"; and (2) "where the association's suit, if successful, would cause a direct detriment to the interests of some of its members and the litigation was not properly authorized." *Retired Chicago Police Ass'n v. City of Chicago ("RCPA II")*, 76 F.3d 856, 864 (7th Cir. 1996). It appears that neither the Fifth Circuit nor the Federal Circuit have expressly addressed this issue. *But see Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1296 (5th Cir. 1992) (Weiner, J., concurring in part and dissenting in part) (noting that the rule that associational standing is defeated when members may have conflicting interest on outcome of litigation has been rejected by most circuits that have considered it).

The Court finds that under both views, the ABPA has established that the alleged conflict in this case should not defeat associational standing. Ford asserts that the interests of the ABPA in this litigation are at odds with the interests of its member LKQ, the exclusive licensee of the

six design patents at issue in this litigation. Under the first view, this conflict of interest would not defeat standing, and could instead be resolved by the ABPA's internal procedures for removal of a member for conduct that "is detrimental to the interests and purposes of the Corporation" (*See* Dkt. #15 at Salamy Declaration Exhibit 4, § 15.02). *See Associated General Contractors*, 950 F.2d at 1409 ("[A]n organization's internal conflicts properly should be resolved through its own internal procedures, not through limitations on standing.") Further, LKQ has an interest in the patents as the exclusive licensee and could intervene to advance its interests against the association's position on the merits, if necessary. *See Weinar v. Rollform, Inc.*, 744 F.2d 797, 807 (Fed. Cir. 1984). This was contemplated by the Supreme Court in *Brock*, and several of the circuit courts considering this issue. *See Nat'l Maritime Union*, 824 F.2d at 1233.

Under the second, and what appears to be the majority, view, there is no "profound" conflict of interest here. While Ford argues that this litigation is "essentially" a suit against LKQ and is detrimental to its proprietary interests in the patents, there is no indication that the ABPA is seeking standing to sue LKQ, which is the first type of "profound" conflict. In fact, the ABPA does not seek standing to sue LKQ and would not have standing to sue LKQ, since LKQ made no threats of litigation against the ABPA and there is no actual injury. The Court now turns to the second "profound" conflict that may defeat associational standing, which occurs "where the association's suit, if successful, would cause a direct detriment to the interests of some of its members and the litigation was not properly authorized." *RCPA II*, 76 F.3d at 864. Ford contends that this litigation is directly detrimental to LKQ's, and only LKQ's, proprietary interests in the patents. No other member of the ABPA is alleged to be harmed by this litigation. LKQ affirms that this litigation is directly adverse to its interests as the exclusive licensee of the

six patents at issue (Dkt. #7, Ex. 8). The ABPA argues that this litigation is not directly adverse to LKQ's interest because if the litigation is successful, LKQ may continue to sell the products and will no longer have to pay licensing fees to Ford for the use of the patents. The ABPA further notes that LKQ's benefit of selling these products exclusively is to the detriment of the other members of the ABPA. The ABPA contends that this litigation was properly authorized in accordance with its procedures. According to the declaration of Ed Salamy, Executive Director of the ABPA, the instant litigation was authorized by a vote of the Board of Directors, where neither the Bylaws nor the Articles of Incorporation of the ABPA requires approval of the members of the ABPA for the institution and funding of litigation in which the ABPA is a member (Dkt. #15, Ex. 3, ¶¶ 7, 10, 11-13). The ABPA Bylaws provide that "[t]he affairs of the Corporation shall be managed by its Board of Directors" and "all corporate powers shall be exercised by or under the authority of, and the business and affairs of the Association shall be controlled by, the Board of Directors." *Id.* at ¶ 7. The Court finds that this is sufficient to show that the litigation was properly authorized by the ABPA's procedures vesting decision-making ability in the Board of Directors, and that no direct detriment exists to LKQ from the instant litigation. *See also Texas Pharmacy Ass'n v. Prudential Ins. Co. of Am.*, 907 F. Supp. 1019, 1021-22 (W.D. Tex. 1995) (rejecting the similar argument that if the litigation was successful and allowed pharmacists to join the network, it could have a detrimental effect on the pharmacists who are already members of the network). Thus, the Court finds that the ABPA has satisfied the second prong of the *Hunt* test for associational standing.

Turning now to the third prong, Ford argues that the ABPA cannot establish standing because the issues of non-infringement, patent exhaustion, and functionality are not "pure questions of law" and instead require individualized proofs. The ABPA has essentially conceded

the issue of infringement, and relies on its claims that the patents are invalid and/or unenforceable based on the doctrines of patent exhaustion and functionality.

The third prong of the *Hunt* test requires that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." The relief requested in this case is a declaration that the "automotive repair part design patents are invalid and/or unenforceable under the doctrines of patent exhaustion and/or functionality and are not infringed by members of the ABPA" (Dkt. #1 at ¶ 17). In addition, the ABPA requests an injunction preventing Ford from enforcing such design patents. *Id*. at ¶ 19. Since the ABPA does not request money damages, this relief does not require the participation of individual members in the litigation. Further, this is the type of relief that the Supreme Court contemplated would be appropriate for associational standing. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind."). This prong of the *Hunt* test "is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food*, 517 U.S. at 557. Thus, even if limited proof is needed from some ABPA members, the potential limited participation by some members is not sufficient to defeat associational standing. *See Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev*., 651 F.3d 218, 230 (2d Cir. 2011) ("The fact that a limited amount of individuated proof may be necessary does not in itself preclude associational standing." (citations omitted)), aff'd, 133 S.Ct. 2321 (2013); *RCPA I*, 7 F.3d at 603 ("We can discern no indication… that the Supreme Court

intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association."). In *Association of American Physicians & Surgeons, Inc. v. Texas Medical Board*, 627 F.3d 547 (5th Cir. 2010), the Fifth Circuit noted the difference between a case that would require a fact intensive analysis of individual members and a case that could be proven by evidence from representative injured members, where "once proved as to some,… would be proved as to all." *Id*. at 552. Looking at decisions from various circuit courts, the Fifth Circuit adopted the approach that found "that as long as resolution of the claims benefits the association's members and the claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry, the participation of those individual members will not thwart associational standing." *Id*.

The claims asserted in the instant case are (1) patent exhaustion, and (2) invalidity for lack of ornamentality or functionality. The "doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Electronics, Inc*., 553 U.S. 617, 625 (2008). The parties agree that patent exhaustion is a question of law, but that requires a factual showing of the initial authorized sale of a patented item in the United States. The doctrine is triggered by the authorized sale of a product that embodies the essential feature of the patented invention and whose only reasonable and intended use is to practice that patent. *Id*. Ford contends that this is a fact-intensive matter that requires the court to analyze the particulars of the transaction at issue (Dkt. #7 at 17). The ABPA contends that this is a simple matter to prove, and can be proven by third parties or by representative injured members of the ABPA (Dkt. #15 at 26). The ABPA further argues that it is likely the parties can stipulate to the first sale of the patented products in this case. *Id*. The Court agrees with the ABPA that to the extent that the initial authorized sale of a patented item

must be fact specific, it is of such a nature that it can be proven by a few representative members of the ABPA, and "once proved as to some,… would be proved as to all." *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 552.[3]

The ABPA also alleges that Ford's design patents are invalid because they are functional. The parties again agree that functionality is a legal question based on underlying facts. Ford argues that this invalidity defense requires the Court to consider whether the appearance of the design as a whole – its overall appearance – was dictated by functional considerations, which include: (1) whether the protected design represents the best design; (2) whether alternative designs would adversely affect the utility of the specified article; (3) whether there are any concomitant utility patents; (4) whether the advertising touts particular features of the design as having specific utility; and (5) whether there are any elements in the design or an overall appearance clearly not dictated by function (Dkt. #7 at 18 (citing *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997)). The ABPA contends that this argument fails when the Court looks to the argument regarding functionality made in the ABPA's complaint. Under 35 U.S.C. § 171, a design must be ornamental to be patentable. However, designs "dictated by function" are considered to be functional and not ornamental, and are therefore not patentable. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993). The ABPA describes this type of functionality as resulting when the design patent covers an article that must look a certain way to fit into or mate with a surrounding article. The ABPA asserts that in the automobile repair parts industry, the original design of the automotive exterior and original design of the automotive part dictates the exact design of the automobile

---

[3] Ford also asserts that the patent exhaustion defense "is not meritorious, as was found in *Ford I*." *Ford I* is attached to Ford's motion as Exhibit 3, which is a decision by the United States International Trade Commission made on May 25, 2006. The ABPA asserts that this decision is not binding on this Court and a 12(b)(1) motion is not the appropriate time to argue the merits of the patent exhaustion doctrine. The Court agrees that this argument and the weight of this decision should be addressed at the appropriate time through the appropriate motion.

repair part. The ABPA contends that this type of functionality does not require fact-intensive individualized proof, and once the patent drawings and the identical repair part (or photographs) become part of the evidentiary record, no further proof is needed from individual members. The ABPA also argues that to the extent that proof is needed to show what products were sold, this can be easily obtained from a representative group of ABPA members without defeating associational standing. Ford does not respond to this argument except to say that it is entitled to discovery on the facts of these defenses, such as the sale and advertising of grills, mirrors, headlamps with other designs, and use as replacement parts.

The Court agrees with the ABPA that the defense of functionality, as it has been asserted in the complaint, will not require member-by-member individualized proof, and to the extent that such proof is necessary, it can be satisfied by a small, representative group of members of the ABPA. Thus, the Court finds the third prong of the *Hunt* test is satisfied, and the ABPA has met its burden to show that it has associational standing to assert its claims on behalf of its members.

Finally, in its reply, Ford requests that the Court exercise its discretion to decline declaratory judgment jurisdiction because: (1) patent litigation is inherently fact-based and is not well-suited to associational standing; (2) no association suit against a patentee has ever been sanctioned; and (3) the present suit is an improper attempt to have this Court legislate through a piecemeal advisory opinion. Ford asserts that the ABPA seeks to broadly invalidate all design patents covering automobile repair parts based on this small sample of six of Ford's design patents. The Court has already addressed Ford's concerns regarding associational standing in a patent case, *supra*. In this case, the ABPA met all the hurdles of the *Hunt* test, demonstrating that it may assert associational standing on behalf of its members. While this may not be the case in every patent suit -- and understandably so due to the fact that many patent cases are

incredibly fact-specific -- under the facts of this case, the ABPA has met its burden. As to Ford's concern that the ABPA seeks to legislate through any decision in this case, the Court has already determined that there is an actual injury in this case, sufficient to confer the ABPA with standing. This is adequate to address Ford's concern, as there is an actual case or controversy at issue here. Thus, the Court will not decline to exercise its declaratory judgment jurisdiction, and finds that Ford's motion should be denied.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends that Ford's Motion to Dismiss for Lack of Standing Under Fed. R. Civ. P. 12(b)(1) (Dkt. #7) be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 4th day of August, 2014.**

---
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE